IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| ALONZO CORTEZ JOHNSON, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 16-CV-433-TCK-CDL |
| | ) | |
| WILLIAM "CHRIS" RANKINS, Warden,[1] | ) | |
| | ) | |
| Respondent. | ) | |

**OPINION AND ORDER**

The United States Court of Appeals for the Tenth Circuit remanded this case for further proceedings as to Petitioner Alonzo Cortez Johnson's claim that he is in state custody in violation of the United States Constitution because the prosecution violated the Fourteenth Amendment's Equal Protection Clause, as interpreted in *Batson v. Kentucky*, 476 U.S. 79 (1986), by exercising peremptory strikes in a racially discriminatory manner to excuse prospective jurors. *Johnson v. Martin*, 3 F.4th 1210, 1217, 1225, 1235-36 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 1189, 212 L. Ed. 2d 55 (2022), and *cert. denied*, 142 S. Ct. 1350, 212 L. Ed. 2d 55 (2022). For the reasons discussed below, the Court concludes that it would be impossible and unsatisfactory to hold a meaningful *Batson* reconstruction hearing. The Court therefore conditionally grants Johnson's petition for writ of habeas corpus as to the *Batson* claim and directs Respondent to release Johnson from state custody unless the State grants Johnson a new trial within 120 days from the entry of this Opinion and Order.

---

[1] Johnson presently is incarcerated at the Great Plains Correctional Center (GPCC) in Hinton, Oklahoma. Dkt. 70, at 7. The Court therefore substitutes the GPCC's acting warden, William "Chris" Rankins in place of Rick Whitten as party Respondent. Rule 2(a), *Rules Governing Section 2254 Cases in the United States District Courts*. The Clerk of Court shall note this substitution on the record.

## I. Background

More than a decade ago, a Tulsa County jury convicted Johnson of first-degree murder and conspiracy to commit murder for his role in a murder-for-hire plot that resulted in the killing of Neal Sweeney, a prominent Tulsa business man. *Johnson*, 3 F.4th at 1217; Dkt. 8, at 10-12; Dkt. 12, at 4-9.[2] Johnson's case proceeded to trial in 2012, and the jury found him guilty of first-degree murder and conspiracy to commit murder and recommended a life sentence for each conviction. *Id.* at 8. The trial court sentenced Johnson accordingly and ordered that he serve the life sentences consecutively. *Id.* The Oklahoma Court of Criminal Appeals (OCCA) affirmed Johnson's judgment and sentence in 2014. *Id.* at 9. Two years later, the OCCA affirmed the state district court's denial of Johnson's application for postconviction relief. *Id.*

Johnson then filed a petition for writ of habeas corpus, under 28 U.S.C. § 2254, asserting seven claims: (1) a *Batson* claim; (2) a Confrontation Clause claim challenging the admission of recorded statements; (3) a due process claim challenging the sufficiency of the evidence; (4) a due process claim challenging the admission of gruesome photographs and testimony; (5) a due process claim alleging juror misconduct; (6) a claim that the trial court's evidentiary rulings violated his constitutional right to present a defense; and (7) a due process claim alleging that cumulative errors rendered the trial fundamentally unfair. Dkt. 1; Dkt. 8, at 2-4. In 2019, this Court denied Johnson's petition for writ of habeas corpus as to all seven claims, entered judgment in Respondent's favor, and declined to issue a certificate of appealability. Dkts. 23, 24.

Johnson appealed, and the Tenth Circuit granted a certificate of appealability to consider four of his claims: (1) the *Batson* claim; (2) the gruesome-evidence claim; (3) the juror-misconduct claim; and (4) the cumulative-error claim. *Johnson*, 3 F.4th at 1217. The Tenth Circuit affirmed

---

[2] Unless otherwise noted, the Court's citations refer to the CM/ECF header pagination.

the denial of habeas relief as to the latter three claims, reversed the denial of habeas relief as to the *Batson* claim, and remanded for further proceedings as to the *Batson* claim. *Id.* at 1235-36.

## II.  Discussion

Johnson's sole remaining claim is that the prosecution violated the Fourteenth Amendment, as interpreted in *Batson*, by exercising five of six peremptory strikes in a racially discriminatory manner to excuse minority prospective jurors.  But the threshold question for this Court is whether the passage of time since Johnson's 2012 trial or any other circumstances make it either impossible or unsatisfactory to conduct a meaningful evidentiary hearing on Johnson's *Batson* claim. *Johnson*, 3 F.4th at 1210.  The Court's consideration of this question proceeds in four parts.  First, the Court discusses the legal framework for assessing a *Batson* claim.  Second, the Court discusses Johnson's claim as it was raised and ruled upon at trial.  Third, the Court discusses the OCCA's rejection of the *Batson* claim, this Court's denial of habeas relief as to that claim, and the Tenth Circuit's reversal and remand for further proceedings as to that claim.  Fourth, and finally, the Court discusses the feasibility of holding a *Batson* hearing in this case over a decade after Johnson's trial.

### A.  Legal framework

"*Batson* held that the 'Equal Protection Clause prohibits the prosecution's use of peremptory challenges to exclude potential jurors on the basis of their race.'" *Johnson*, 3 F.4th at 1219 (quoting *Saiz v. Ortiz*, 392 F.3d 1166, 1171 (10th Cir. 2004)). *Batson* established a three-step, burden-shifting framework for trial courts to consider a claim that a prosecutor has used peremptory challenges in a racially discriminatory manner. *Miller-El v. Cockrell*, 537 U.S. 322, 328 (2003).

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race.  Second, if that showing has been made,

3

> the prosecution must offer a race-neutral basis for striking the juror in question. Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Id.* at 328-29 (internal citations omitted). At the second step, the proffered nondiscriminatory reason need not be "persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 768 (1995). Rather, "[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* (quoting *Hernandez v. New York*, 500 U.S. 352, 360 (1991) (plurality opinion)). At the third step, "the persuasiveness of the justification becomes relevant" because the third step requires the trial court to assess whether the opponent of the strike has met his or her burden to show purposeful discrimination. *Id. See also Purkett*, 514 U.S. at 768 (noting that "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike").

Appellate courts considering a *Batson* claim apply this same framework and, like the trial court, must consider "all of the circumstances that bear upon the issue of racial animosity" in determining, at the third step, whether the opponent of the strike has shown purposeful discrimination. *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008). But an appellate court must give a trial court's factual "findings great deference" and sustain the trial court's "ruling on the issue of discriminatory intent . . . unless it is clearly erroneous." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2244 (2019). This is so because trial courts play a "pivotal role" in discerning discriminatory intent at *Batson*'s third step—the step that requires the trial court to assess the credibility of the prosecutor's stated reasons for striking a prospective juror—based on the trial court's "firsthand observations" of the demeanor of both the prosecutor and the prospective juror who has been stricken. *Snyder*, 552 U.S. at 477; *see also Flowers*, 139 S. Ct. at 2243 ("[T]he job of enforcing *Batson* rests first and foremost with trial judges.").

4

Federal courts considering a *Batson* claim on habeas review also apply the three-step framework, but a federal habeas court reviewing a state court's factual findings and its ultimate decision regarding a *Batson* claim must view those findings and the state court's decision with even more deference than an appellate court. *See Collins*, 546 U.S. at 343-44 (Breyer, J., concurring) (discussing *Batson* and noting that "considerations of federalism require federal habeas courts to show yet further deference to state-court judgments"). A federal habeas court's review of a *Batson* claim is guided by 28 U.S.C. § 2254(d)(2)'s requirement that the state-court's factual determination must be unreasonable considering the evidence presented in state court and by 28 U.S.C. § 2254(e)(1)'s presumption that a state court's factual findings are presumed correct absent clear and convincing evidence to the contrary. *Grant v. Royal*, 886 F.3d 874, 949-50 (10th Cir. 2018).

### B. Johnson's *Batson* challenge at trial

At trial, the State was represented by two prosecutors from the Tulsa County District Attorney's Office, Tim Harris and Doug Drummond, and Johnson was represented by defense attorney Mark Lyons. Dkt. 13-24, Tr. Trial vol. 1, at 10.[3] Tulsa County District Court Judge Tom Gillert, who is now retired, presided over Johnson's trial. Dkt. 66, at 9. According to Lyons, Johnson's trial "was racially charged from the beginning" because Johnson is African American, and he conspired with other minorities (three African Americans and one Pakistani) to murder a "prominent white man." Dkt. 67, at 15. During jury selection, Harris exercised the State's first six peremptory challenges in the following order: (1) Dr. Tawil, (2) Professor Dickens, (3) Ms. Aramburo de Wassom, (4) Ms. L. Wilson, (5) Ms. Carranza, and (6) Ms. Martinez. Dkt. 13-25,

---

[3] When citing original transcripts of state court proceedings, the Court refers to the CM/ECF header pagination followed by the original pagination, in brackets, if the original page number differs from the CM/ECF header pagination.

Tr. Trial vol. 2, at 179-82 [219-22].

After Harris used his second peremptory challenge to strike Professor Dickens, the trial court—without any *Batson* challenge from Johnson—immediately asked for a "race neutral reason." Dkt. 13-25, at 180 [220]. Drummond responded, "Judge, he has a Ph.D., we're concerned about him being a professor of liberal arts. It's been my practice to not keep those type of educated people, Ph.D.'s in liberal arts, on the jury. We think they're too exacting at times, too liberal." *Id.* The trial court then stated, "Well, I'll determine there's a race neutral reason. There are other prospective African Americans on the jury." *Id.*

After Harris exercised the State's sixth peremptory challenge to excuse Ms. Martinez, Johnson raised a *Batson* challenge:

> MR. LYONS: Your Honor, I'd like to point out at this point that I think every peremptory challenge by the State so far except Ms. Wilson has been of a minority, Dr. Tawil, Ms. Carranza, Ms. Aramburo de Wassom, Ms. [Martinez], and Mr. Dickens. And there's a pattern here, Your Honor, of striking all minorities off this jury.[4]
>
> THE COURT: Well, I don't think that this establishes a pattern. Again, in terms of - - Ms. Martinez, I won't state their reasons for them, but Ms. Martinez was patently - - she was hardly involved in the process. Ms. Carranza has indicated she has difficulty with English, Ms. Aramburo de Wassom told us the same. So I do not see a pattern here. And we'll note your exception.

*Id.* at 181-82 [221-22]. Harris waived the State's seventh peremptory challenge then attempted to exercise its eighth challenge to excuse Ms. Williams. *Id.* at 182-83 [222-23]. This time, without any objection from Johnson or any request from the trial court for a race-neutral reason, Harris explained:

> MR. HARRIS: Judge, the State of Oklahoma would excuse Ms. Williams. I understand she's African American, but our race neutral reason for her is she's a

---

[4] In listing the five prospective jurors stricken by the State, Lyons twice referred to Ms. Carranza. In context, however, it appears Lyons intended to refer to Ms. Martinez the second time. Dkt. 13-25, at 181 [221].

6

pastor. I think pastors traditionally are very, very forgiving, have trouble with judgment. She's worked with drug addicts and counseled them in the past showing the State of Oklahoma a propensity towards treatment rather than judgment. For those reasons - -

THE COURT: Well, you would have effectively eliminated all the African Americans and I'm not going to do that.

MR. HARRIS: Okay.

THE COURT: So you can exercise some other challenge if you choose.

Dkt. 13-25, at 182-84 [223-24]. Harris then used his eighth peremptory challenge to excuse Ms. Nichols and waived the State's ninth peremptory challenge. *Id.* at 184 [224]. It appears there were three prospective jurors who could have served as alternate jurors: Ms. Sweet, Ms. Malsam, and Ms. Ismert. *Id.* at 184-86 [224-26]. Harris used a peremptory challenge to excuse Ms. Ismert. *Id.* at 185 [225]. Johnson did not raise a *Batson* challenge when Harris excused either Nichols or Ismert. *Id.* at 184-85 [224-25].

### C. State appellate and federal habeas rulings on the *Batson* claim

Johnson raised a *Batson* claim on direct appeal, reasserting his view that the "prosecutor systematically removed minorities from the jury," and the OCCA rejected it. *Johnson*, 3 F.4th at 1220. The OCCA found no *Batson* violation, reasoning, in relevant part, (1) "that the trial court's determination that the State's explanations for excusing each of the minority jurors were legitimate race-neutral reasons is not clearly against the logic and effects of the facts presented," and (2) that Johnson "ultimately failed to establish purposeful discrimination on the part of the State." Dkt. 12-4, at 3.[5] When Johnson reasserted his *Batson* claim in his federal habeas petition, this Court

---

[5] Johnson also raised his *Batson* claim in his application for postconviction relief, but the state district court and the OCCA concluded that consideration of that claim on postconviction review was barred by res judicata. *Johnson*, 3 F.4th at 1220.

7

reviewed that claim within the confines of § 2254(d)[6] and denied habeas relief. Dkt. 23, at 3-7.

The Tenth Circuit reversed this Court's decision as to the *Batson* claim. First, the Tenth Circuit concluded that this Court "erred by treating his *Batson* claim as aimed at the third step of *Batson*." *Johnson*, 3 F.4th at 1222-23. Next, the Tenth Circuit concluded that § 2254(d) did not bar habeas relief because the OCCA's decision was (1) based on an unreasonable determination of the facts and (2) involved an unreasonable application of *Batson*. *Id.* at 1223-25. As to the first point, the Tenth Circuit reasoned that the OCCA "expressly approved of the trial court's determination that the prosecutor's '*explanations* for excusing *each* of the minority jurors were legitimate race-neutral *reasons*," even though the "record plainly shows that the trial court only determined that *one* explanation offered by the prosecutor for excusing *one* minority juror [Dickens] was a legitimate race-neutral reason" before the trial court then offered "its *own* reasons for the strikes, speculating as to what the prosecutor's reasons might have been." *Id.* at 1223 (emphases in original). As to the second point, the Tenth Circuit reasoned, "to the extent that the OCCA considered the trial court's sua sponte speculation about potential race-neutral reasons as part of the *Batson* analysis, doing so was an unreasonable application of *Batson*" because *Batson*'s second step requires a trial court to "ask the prosecutor to provide reasons, rather than merely speculating about what such reasons might be." *Id.* at 1224.

Reviewing the *Batson* claim de novo, the Tenth Circuit determined, at *Batson*'s first step, that Johnson "made a prima facie showing of racial discrimination" based on the prosecution's

---

[6] Section 2254(d) imposes preconditions to federal habeas relief. *Fry v. Pliler*, 551 U.S. 112, 119 (2007). Specifically, a federal court "shall not" grant habeas relief as to a federal claim that was adjudicated on the merits in state court unless the petitioner first shows that the state court's adjudication of that claim resulted in a decision that either "(1) was contrary to, or involved an unreasonable application of, clearly established Federal law, or (2) was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Hancock v. Trammell*, 798 F.3d 1002, 1010 (10th Cir. 2015).

"clear pattern of strikes against five of six minority jurors." *Id.* at 1225-27. In making that determination, the Tenth Circuit rejected the State's contention "that there is no inference of discrimination here because Johnson 'did not even make a record as to the races' of each of the jurors at issue," noted that "neither the trial court nor the prosecutor objected to defense counsel's representation that the prosecutor had used five of six strikes against minorities," and concluded that "the absence of a record as to the specific racial makeup of the five minority jurors is not fatal to Johnson's prima facie case of discrimination." *Id.* Ultimately, the Tenth Circuit concluded that the trial court erred at *Batson*'s second step because instead of asking the prosecution to provide race-neutral reasons for each strike, the trial court "rel[ied] instead on its own speculation as to what might have been the prosecutor's reasons." *Id.* at 1227 (alteration added) (quoting *Paulino v. Castro*, 371 F.3d 1083, 1092 (9th Cir. 2004)).

But the Tenth Circuit further concluded that the trial court's error did "not automatically entitle Johnson to habeas relief" because "the State has never presented evidence of the prosecutor's actual, nondiscriminatory reasons for striking the five minority jurors." *Id.* The Tenth Circuit thus determined that the appropriate remedy was to remand the case for a "*Batson* reconstruction hearing." *Id.* "A *Batson* reconstruction hearing is 'an evidentiary hearing that takes place some[]time after the trial, where the prosecutor testifies to [his or] her actual reasons for striking the venire[]members in question, or the State presents circumstantial evidence of those reasons.'" *Id.* (alterations in original) (quoting *Paulino v. Harrison*, 542 F.3d 692, 700 (9th Cir. 2008)). However, the Tenth Circuit expressly stated that "[b]efore conducting such a hearing, [this Court] should consider whether the passage of over eight years since Johnson's trial or any other circumstances have made such an inquiry 'impossible or unsatisfactory.'" *Id.* (quoting *Jordan v. Lefevre*, 206 F.3d 196, 202 (2d Cir. 2000)). The Tenth Circuit instructed that if this Court

9

"concludes that a *Batson* reconstruction hearing is impossible or unsatisfactory, it must grant habeas relief in the form of an order that Johnson be released from custody unless the State grants him a new trial within 120 days from the entry of the district court's order." *Id.*

### D. Feasibility of a *Batson* reconstruction hearing

While the Tenth Circuit did not elaborate on the criteria for determining whether a *Batson* reconstruction hearing would be impossible or unsatisfactory, the propriety of holding such a hearing is within the discretion of this Court. *Jordan*, 206 F.3d at 202. After the Tenth Circuit issued its mandate, this Court directed the parties to brief the issues that must be addressed on remand. Dkt. 48. On consideration of those briefs (Dkts. 49, 50), the Court determined that it was necessary to expand the record so that this Court could adequately assess whether it would be possible or satisfactory to reconstruct a *Batson* hearing. The Court thus directed the parties to engage in discovery and develop a record that would be sufficient for this Court to make that assessment. *Id.* After the close of discovery, each party submitted a post-discovery brief, along with supporting exhibits. Dkts. 66, 67.[7] The parties strongly disagree as to whether the passage of time or any other circumstances render it impossible or unsatisfactory to reconstruct a *Batson* hearing.

Johnson objects to a reconstruction hearing on three grounds. First, he contends a hearing would be unsatisfactory because the State has forfeited or waived its right to a *Batson* hearing. Dkt. 67, at 11-13. Specifically, Johnson contends that "[a]llowing the State to manufacture *post*

---

[7] Respondent's exhibits include an affidavit from an agent with the Oklahoma Attorney General's office, the prosecutors' contemporaneous notes from jury selection, documentary evidence establishing the racial makeup of all 33 members of the jury pool, and transcripts of the depositions of both prosecutors who represented the State at trial, Johnson's trial counsel, and the trial judge. Dkts. 66-1 through 66-6. Johnson also submitted the transcripts of the same four depositions. Dkts. 67-1 through 67-4.

*hoc* reasons for its racially discriminatory strikes over eleven years after the fact seems fundamentally unfair to Johnson." *Id.* at 12. Second, he contends the Supreme Court has never "recognized that [a] 'reconstruction hearing' is a legitimate legal mode of analysis to salvage a *Batson* claim when an error is found at any of the three steps" and that the Supreme Court has been critical of federal courts that rely on a prosecutor's "after-the-fact explanations for strikes" in assessing *Batson* claims. *See id.* at 14 (quoting *Miller-El v. Dretke*, 545 U.S. 231, 252 (2005), for the proposition that the validity of a challenged strike "must 'stand or fall' on the plausibility of the explanation given for it at the time"). Third, he contends that even if Supreme Court precedent permits *Batson* reconstruction hearings, the depositions submitted by both parties demonstrate testimony that a *Batson* hearing "cannot be reconstructed under the facts and circumstances of this case." *Id.* at 15, 21-25.

Respondent counters that a reconstruction hearing is "undeniably feasible" in this case. Dkt. 66, at 41. Respondent contends the evidence that "was unearthed during discovery" shows that, despite the passage of time, Respondent would be able to (1) present direct evidence of the prosecution's actual reasons for exercising the State's peremptory challenges through Harris's testimony, (2) present circumstantial evidence of those reasons through contemporaneous notes created by both prosecutors regarding jury selection and testimony from Drummond and Judge Gillert, and (3) establish the racial and ethnic makeup of the jury pool. *Id.* at 34-40.

Having carefully considered the transcripts of voir dire, the parties' post-discovery briefs and supporting exhibits, and applicable law, the Court concludes that it would be both impossible and unsatisfactory to reconstruct a meaningful *Batson* hearing in this case. As previously discussed, the Tenth Circuit determined that Johnson made a prima facie showing that a pattern of discrimination existed based on the prosecution's decisions to strike five prospective jurors:

11

(1) Dr. Tawil, who self-identifies as white, was born in Syria, speaks Arabic as his first language, and speaks English fluently; (2) Professor Dickens, who self-identifies as African American, speaks English as his first language, and speaks Spanish proficiently; (3) Ms. Aramburo de Wassom, who is identified on her driver's license as white, self-identifies as Mexican, speaks Spanish as her first language, and had been speaking English for 15 years at the time of trial; (4) Ms. Carranza, who is identified as white on her driver's license and, according to the transcript from voir dire, speaks English as a second language; and (5) Ms. Martinez, who self-identifies as white and speaks English as her first language. Dkt. 66-1, at 2-3, 5-6; Dkt. 13-25, at 12 [52].[8] Any reconstruction hearing would therefore require this Court to focus, at step two, on ascertaining the State's proffered reasons for excusing these five jurors, and, at step three, on determining whether, under all relevant circumstances, those reasons are either plausible or pretext for purposeful discrimination. *Id.* at 1227-28.

Arguably, it would not be impossible or unsatisfactory to reconstruct that portion of a *Batson* hearing that pertains to step two. At trial, the prosecution provided a reason for striking one of these five jurors: Professor Dickens. *Johnson*, 3 F.4th at 1219. Drummond explained that the prosecution was "concerned about [Dickens] being a Professor of Liberal Arts" and that, generally, the prosecution "does not keep those type of educated people," i.e., those who have Ph.D.s in Liberal Arts, on the jury. *Id.* Through his sworn deposition testimony, Harris provided

---

[8] An agent with the Oklahoma Attorney General's office obtained driver's license information for all members of the jury pool and contacted all members of the jury pool to ascertain their self-identified races and/or ethnicities and their languages but was unable to contact Ms. Carranza. Dkt. 66-1, at 1. Twenty-nine prospective jurors were white; three were black or African American; and one was American Indian. *Id.* at 1-6. It does not appear, either from the original or the expanded record, that Ms. Martinez identifies herself as anything other than white. However, at trial the State did not object when Johnson identified Martinez as a minority and the Tenth Circuit considered Martinez a minority at *Batson*'s step one. *Johnson*, 3 F.4th at 1220 n.6.

additional reasons for striking Dickens[9] and provided reasons for excusing the four remaining minority jurors. Dkt. 66-5. Respondent also provided this Court with contemporaneous notes both prosecutors made during jury selection and documentary evidence regarding the races of all 33 members of the jury pool, and in some instances, the ethnicities of prospective jurors.[10] Dkts. 66-1, 66-2. As Respondent contends, these exemplify the types of evidence that courts may consider when attempting to reconstruct a *Batson* hearing. *See* Dkt. 66, at 30-32 (citing cases).

But it would be both impossible and unsatisfactory to reconstruct that portion of a *Batson* hearing that pertains to *Batson*'s third step. Even assuming without deciding that Harris's stated reasons for striking each minority juror subject to the *Batson* challenge are his actual reasons for the strikes—i.e., that those proffered reasons are untainted by Harris's thorough review of transcripts of voir dire[11]—this Court cannot sufficiently reconstruct all relevant circumstances in a way that would permit this Court to meaningfully apply *Batson*'s third step. At that step, this Court would be obligated to decide, based on all "relevant circumstances that bear upon the issue

---

[9] Harris testified that, after preparing for his deposition, he remembered additional reasons for striking Dickens. Specifically, he testified that "[Dickens] also said that he likes to use his communication ability teaching to help college students find their way, their way in life. And I looked at that and said, you know what, that's tantamount to doing social work. Very admirable, okay, but not necessarily what I wanted in a juror." Dkt. 66-5, at 18. Harris further recalled that he was concerned when defense counsel asked if Dickens "recognize[d] the difference between not guilty and innocent" and Dickens, an English professor, responded, "absolutely." *Id.* Harris explained that this response was concerning because, in Harris's view, "most people would struggle with the difference between innocent and not guilty." *Id.*

[10] Twenty-nine prospective jurors were white; three were black or African American; and one was American Indian. *Id.* at 1-6.

[11] Harris testified that he "probably, from beginning to end, went over [the transcripts of voir dire] three full times" and that "for some of the individuals highlighted in this appeal, spent extra time looking at their responses to [his] questions and Mr. Lyons' questions, making notes of pages in the transcript that [he] thought supported [his] position of race neutral strikes." Dkt. 66-5, at 8.

13

of racial discrimination," *Flowers*, 139 S. Ct. at 2243, whether Johnson has met his "ultimate burden of showing purposeful discrimination," *Johnson*, 3 F.4th at 1228. However, the Court in this case must attempt to reconstruct those circumstances as they existed at the time the *Batson* challenge was made—more than ten years ago. Moreover, the Court must assess the real intent for the peremptory strikes, and Johnson—who carries the burden of persuasion at each step—should be permitted to offer evidence to rebut the stated reasons for excusing minority jurors. *See Hardcastle v. Horn*, 368 F.3d 246, 259-60 (3d Cir. 2004) (explaining that after prosecutor asserts race-neutral reasons for peremptory challenges, defendant raising *Batson* challenge "should be afforded the opportunity to show any weaknesses he may find with the justifications for the strikes"). Critically though, Harris's stated reasons for striking two prospective jurors, rely, in part, on circumstances that cannot be reconstructed. For example, Harris testified that he primarily excused Dr. Tawil based on Harris's perception that comments between Tawil and Dr. V. Wilson regarding whether they knew each other while both attended medical school at Wake Forest signaled to Harris that there might be "trouble in paradise" between these two prospective jurors. Dkt. 66-5, at 17.[12] Harris also cited his "visual observation" of Dr. Tawil's "facial expression" in response to a question from Johnson's attorney and explained that Tawil's expression led Harris to believe that Tawil was prejudging the evidence in Johnson's favor and did not "like the State." *Id.* Similarly, Harris testified that he exercised the State's sixth peremptory challenge against Ms.

---

[12] When Respondent's counsel asked Harris to explain his reasons for exercising the State's fourth peremptory challenge against Ms. L. Wilson, Harris testified he could "definitely" remember his reason as "the Wilson/Tawil combo" and explained that his "impression of her is she was upset with the fact that Dr. Tawil did not recognize her as his attending physician" and her "employment at St. John Hospital" and the possibility that she might know Harris's wife, who is also a doctor at St. John Hospital. Dkt. 66-5, at 19. Respondent's counsel clarified that she had asked about the strike against Ms. L. Wilson, not Dr. V. Wilson, the latter of whom was part of the "Tawil/Wilson combo" and was excused by Johnson, not the State. *Id.*

Martinez because she had previously been called for jury duty, had served as a juror one time, and, in his view, her "attitude from the get-go" and her "tone" "telegraphed" to Harris that Martinez did not want to serve on the jury. Dkt. 66-5, at 20-21. Harris also testified that, "other times in the trial, [Martinez] wasn't even paying attention to some of the other stuff that was going on" leading Harris to think, "okay, you have to get involved in this." *Id.* These "[d]emeanor-based explanations for a strike are particularly susceptible to serving as pretexts for discrimination." *Harris v. Hardy*, 680 F.3d 942, 965 (7th Cir. 2012); *cf. Students for Fair Admissions, Inc. v. President and Fellows of Harvard College*, 143 S. Ct. 2141, 2190-91 (June 29, 2023) (Thomas, J., concurring) (recognizing that is "error for a court to defer to the views of an alleged discriminator while assessing claims of racial discrimination" and explaining that "judicial skepticism is vital" because "[h]istory has repeatedly shown that purportedly benign discrimination may be pernicious, and discriminators may go to great lengths to hide and perpetuate their unlawful conduct"). And the circumstances for assessing the plausibility of these demeanor-based explanations for a strike are particularly impossible to reconstruct at an evidentiary hearing that takes place over ten years

after the trial.[13] Regardless of how credible this Court might find Harris's hearing testimony about his memory of the facial expressions or attitudes of prospective jurors who were stricken over ten years ago, this Court's firsthand observation of Harris's responses to questions from counsel on direct and cross-examination at a hearing over a decade after the trial is no fair substitute for the trial court's "firsthand observations" of both (1) Harris's demeanor at trial as he explained (or in this case should have explained) in real time why he was striking a prospective juror and (2) the prospective juror's demeanor. *See Snyder*, 552 U.S. at 477 ("[R]ace-neutral reasons for peremptory challenges often invoke a juror's demeanor (e.g., nervousness, inattention), making the trial court's firsthand observations of even greater importance"); *Hernandez*, 500 U.S. at 365 (stating that the "evaluation of the prosecutor's state of mind based on demeanor and credibility

---

[13] To be fair, when the trial judge improperly supplied the State's reason for dismissing Ms. Martinez, the trial court stated that Martinez was "hardly involved in the process." *Johnson*, 3 F.4th at 1222. On one hand, the trial court's comment could be viewed as evidence from 2012 that supports Harris's reason for excusing Martinez that he first identified in 2023. On the other hand, given the passage of time since the trial and Harris's testimony that he extensively reviewed trial transcripts to prepare for his deposition, the trial court's comment could be viewed as creating the basis for Harris's memory of his reason for striking Martinez. *See* Dkt. 66-5, at 8 (Harris testifying that he "probably, from beginning to end, went over [the transcripts of voir dire] three full times" and that "for some of the individuals highlighted in this appeal, spent extra time looking at their responses to my questions and Mr. Lyons' questions, making notes of pages in the transcript that I thought supported my position of race neutral strikes"); *Sanchez v. Roden*, 808 F.3d 85, 93 (1st Cir. 2015) (Thompson, J., concurring) (noting that "[w]hen defense counsel first raised a *Batson* challenge in state court way back in September of 2006, the trial judge was ready with an immediate (and inappropriate) response" and that "it should come as no surprise that nearly eight years later, when finally called upon to explain why he struck that particular juror, the prosecutor seized upon the juror's 'youth'" and "[i]n doing so, the prosecutor did nothing more than parrot back the trial judge's unprompted suggestion"). This provides a prime example of why it is both impossible and unsatisfactory to reconstruct a *Batson* hearing in this case.

lies peculiarly within a trial judge's province").[14] Put simply, it would both impossible and unsatisfactory to reconstruct a *Batson* hearing in this case because this Court can neither reasonably expect Johnson to "show any weaknesses" in Harris's demeanor-based justifications for striking at least two minority jurors nor meaningfully assess whether these same justifications are plausible "in light of all of the relevant facts and circumstances" or, instead, are merely pretext for purposeful discrimination. *Flowers*, 139 S. Ct. at 2243.

### III. Conclusion

For the reasons stated, the Court concludes it would be both impossible and unsatisfactory to reconstruct a *Batson* hearing in this case. As directed by the Tenth Circuit, the Court therefore conditionally grants Johnson's petition for writ of habeas as to the *Batson* claim and directs Respondent to release Johnson from state custody unless the State grants him a new trial within 120 days from the entry of this Opinion and Order. *Johnson*, 3 F.4th at 1227.

**IT IS THEREFORE ORDERED** that Johnson's petition for writ of habeas corpus (Dkt. 1) is **conditionally granted** as to the *Batson* claim asserted in ground one.

**IT IS FURTHER ORDERED** that Respondent shall release Johnson from state custody unless the State grants Johnson a new trial within 120 days from the entry of this Opinion and Order.

---

[14] Notably, Johnson's trial attorney, Mark Lyons testified through his deposition that he raised a *Batson* challenge at trial because the prosecutors made a "series of peremptory strikes on jurors that were all minorities" and that he felt it "was obvious" from the "atmosphere in the courtroom" and the "demeanor of the assistant district attorneys" that the strikes were purposeful and discriminatory. Dkt. 67-1, at 25. Again, in an ordinary case, courtroom atmosphere and the demeanor of the prosecutors would be highly relevant to a trial court's evaluation of purposeful discrimination at *Batson*'s third step. But it would be difficult, if not impossible for this Court to fairly reconstruct these circumstances in this case through a decades-later evidentiary hearing.

**IT IS FURTHER ORDERED** that Respondent shall file a status report no later than 30 days after the entry of this Opinion and Order, and every 30 days thereafter, until the 120-day period expires or the State complies with the conditional grant of relief, whichever occurs first. Respondent shall file a notice of compliance no later than 14 days after the State complies with the conditional grant of relief.

**IT IS FURTHER ORDERED** that the Clerk of Court shall note the substitution of William "Chris" Rankins, Acting Warden, in place of Rick Whitten as party Respondent.

**IT IS FURTHER ORDERED** that a separate judgment shall be filed in this matter.

**DATED** this 8th of August 2023.

TERENCE C. KERN
United States District Judge