## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **ALONZO CORTEZ JOHNSON,** | |
| **Petitioner,** | |
| **v.** | **Case No. 16-CV-0433-SEH-CDL** |
| **SCOTT TINSLEY, Interim Warden,**[1] | |
| **Respondent.** | |

## OPINION AND ORDER

This matter is before the Court on Petitioner Alonzo Cortez Johnson's petition for writ of habeas corpus under 28 U.S.C. § 2254 [ECF No. 1],[2] following an evidentiary hearing on his sole remaining habeas claim:  that the State of Oklahoma ("State") violated the Fourteenth Amendment's Equal Protection Clause, as interpreted in *Batson v. Kentucky*, 476 U.S. 79 (1986), by exercising peremptory challenges in a racially discriminatory manner to excuse five minority prospective jurors.  On consideration of the relevant portions of the state court record, the federal habeas record developed

---

[1] Mr. Johnson presently is incarcerated at the Dick Conner Correctional Center in Hominy, Oklahoma.  [ECF No. 109 at 1 n.1.]  The Court thus substitutes the interim warden of that facility, Scott Tinsley, in place of David Rogers as party Respondent.  Fed. R. Civ. P. 25(d); Rule 2(a), *Rules Governing Section 2254 Cases in the United States District Courts*.  The Clerk of Court shall note on the record this substitution.

[2] Unless otherwise noted, the Court's citations refer to the CM/ECF header pagination.

through discovery and an evidentiary hearing, the parties' arguments, and applicable law, the Court finds and concludes that Johnson has not met his burden, at *Batson*'s third step, to show purposeful discrimination.[3]  The Court therefore DENIES the petition.

## I. Background

In 2012, a Tulsa County jury convicted Johnson of first-degree murder and conspiracy to commit murder for his role in a murder-for-hire plot that resulted in the killing of Neal Sweeney, a prominent Tulsa businessman. *Johnson v. Martin*, 3 F.4th 1210, 1217 (10th Cir. 2021) ("*Johnson I*").  The conspiracy involved five individuals:  Mohammed Aziz ("Aziz"), Allen Shields ("Allen"), Fred Shields ("Fred"), Terrico Bethel ("Bethel"), and Johnson.  *Id.*  Aziz hired the Shields brothers to kill Sweeney; Fred recruited Bethel to

---

[3] As further discussed below, *Batson* established a three-step framework for analyzing a claim that a prosecutor has used peremptory challenges in a racially discriminatory manner.  *Miller-El v. Cockrell*, 537 U.S. 322, 328 (2003) ("*Miller-El I*").

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race.  Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question.  Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Id.* at 328-29 (internal citations omitted).

shoot Sweeney; and Fred recruited Johnson to obtain the vehicle Bethel drove to Sweeney's office on the morning of the shooting.  *Id.*  The trial court sentenced Johnson to two consecutive terms of life imprisonment.[4]  *Id.*  The Oklahoma Court of Criminal Appeals ("OCCA") affirmed Johnson's judgment and sentence in 2014.  *Id.*  Two years later, the OCCA affirmed the state district court's denial of Johnson's application for postconviction relief.  *Id.*

Johnson then filed the instant federal habeas petition, asserting a *Batson* claim and six other claims.  [ECF Nos. 1, 8.]  This court denied the petition and entered judgment in Respondent's favor, and Johnson appealed.  [ECF Nos. 23, 24, 25.]  The United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") granted Johnson a certificate of appealability as to four claims, affirmed the denial of relief as to three claims, and reversed the

---

[4] Johnson's co-conspirators faced similar charges.  [ECF No. 13-42 at 99-102.]  A jury convicted Bethel of first-degree murder and conspiracy to commit murder, and he was sentenced to a term of life without the possibility of parole and a consecutive term of ten years' imprisonment.  [ECF No. 13-49 at 133-38.]  A jury convicted Fred of first-degree murder and conspiracy to commit murder, and he received consecutive sentences of life without parole and life.  [ECF No. 13-50 at 128-33.]  Aziz pleaded guilty to solicitation of murder and was sentenced to a term of thirty-five years' imprisonment.  [ECF No. 13-54 at 75-81.]  Allen pleaded guilty to conspiracy to commit murder and received a ten-year suspended sentence.  [ECF No. 13-43 at 57-63.]  Aziz testified at Johnson's trial.  [ECF No. 23 at 10.]  Allen also was a cooperating co-defendant but he committed suicide before Johnson's trial, so the transcript of his preliminary hearing testimony was admitted at Johnson's trial.  [*Id.*]

denial of relief as to the *Batson* claim. *Johnson I*, 3 F.4th at 1235-36. The Tenth Circuit remanded the case with instructions "to either hold a *Batson* reconstruction hearing or to determine that such a hearing would be impossible or unsatisfactory." *Id.* at 1236.[5] The Tenth Circuit further instructed that if this court determined a hearing would not be feasible, this court should grant a conditional writ of habeas corpus. *Id.* at 1227.

Following the remand, this court considered evidence developed through post-remand discovery and arguments from both parties, concluded "it would be both impossible and unsatisfactory to reconstruct a *Batson* hearing in this case," granted Johnson a conditional writ directing Respondent to release him from custody unless the State granted him a new trial within 120 days from the date of the conditional writ, and entered judgment in Johnson's favor. [ECF Nos. 71, 72.] Respondent appealed. [ECF No. 73.] The Tenth Circuit determined this court abused its discretion in assessing the feasibility of a *Batson* reconstruction hearing, reversed the grant of relief as to the *Batson* claim, and remanded the case with instructions to hold the hearing.

---

[5] "A *Batson* reconstruction hearing is 'an evidentiary hearing that takes place some[]time after the trial, where the prosecutor testifies to [his or] her actual reasons for striking the venire[]members in question, or the State presents circumstantial evidence of those reasons.'" *Johnson I*, 3 F.4th at 1227 (alterations in original) (quoting *Paulino v. Harrison*, 542 F.3d 692, 700 (9th Cir. 2008)).

*Johnson v. Rankins*, 104 F.4th 194, 195-96 (10th Cir. 2024) ("*Johnson II*"), *cert. denied* 145 S. Ct. 1081 (Jan. 13, 2025).

Following the second remand, this Court reinstated the petition for further proceedings on the *Batson* claim.  [ECF No. 93.]  The Court held a *Batson* reconstruction hearing on March 24, 2025.  [ECF Nos. 105, 107.] Respondent presented testimony from both prosecutors who represented the State at Johnson's trial, Judge Doug Drummond[6] (former First Assistant District Attorney for Tulsa County) and Timothy Harris (former District Attorney for Tulsa County); the now retired Tulsa County district judge who presided over the trial, Judge Thomas Gillert; and an agent with the Oklahoma Office of Attorney General, Tobias Federick, who gathered information about the races and ethnicities of and languages spoken by prospective jurors.  [ECF No. 107, Tr. Hr'g, at 12-174.]  Respondent also presented over forty exhibits, including the first two volumes of Johnson's trial transcripts ("*voir dire* transcripts"); Harris's and Drummond's contemporaneous notes from jury selection; and Federick's compilation information about the racial and ethnic makeup of the jury pool.  [Resp. Exs. 1-44.]  Johnson presented testimony from the criminal defense attorney who

---

[6] To avoid confusion regarding his role during the relevant events, Judge Doug Drummond will be referred to as "Drummond" hereafter.

represented him at trial, Mark Lyons, and Lyons's former paralegal, Brittany Morgan (formerly Brittany Warner).  [ECF No. 107, Tr. Hr'g, at 175-211.][7] As directed by the Court, both parties submitted proposed findings of fact and conclusions of law in July 2025.  [ECF Nos. 109, 110.]

## II. Discussion

Johnson's *Batson* claim asserts that the prosecutors exercised the State's peremptory challenges in a racially discriminatory manner to excuse five prospective jurors he perceived as minorities at the time of jury selection:  Dr. Tawil, Mr. Dickens, Ms. Carranza, Ms. Aramburo de Wassom, and Ms. Martinez.[8]  [ECF No. 8 at 13-17; ECF No. 12-1 at 14; Resp. Ex. 2, at 219-22.][9]

### A. *Batson*'s burden-shifting framework

---

[7] Johnson also presented testimony from his son, Alonzo Cortez Johnson, Jr., regarding a brief encounter Johnson's son had with Harris at a church sometime after Johnson's trial, where Harris introduced himself to Johnson's son.  [ECF No. 107, Tr. Hr'g, at 212-17.]  The Court excluded this testimony, over Johnson's objection, finding it was not relevant to the issues before the Court.  *Id.*

[8] The Court refers to prospective jurors and jurors who served by their titles and last names.

[9] Respondent's Exhibits 1 and 2 are the *voir dire* transcripts.  The Court's citations to Respondent's Exhibits 1 and 2 refer to the original transcript pagination, not the CM/ECF header pagination.

"*Batson* held that the 'Equal Protection Clause prohibits the prosecution's use of peremptory challenges to exclude potential jurors on the basis of their race.'" *Johnson I*, 3 F.4th at 1219 (quoting *Saiz v. Ortiz*, 392 F.3d 1166, 1171 (10th Cir. 2004)). More recently, the Supreme Court reiterated that "[t]he Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Flowers v. Mississippi*, 588 U.S. 284, 303 (2019).[10]

As previously noted, *Batson* established a three-step, burden-shifting framework for courts considering a claim that a prosecutor has used peremptory challenges in a racially discriminatory manner. *Miller-El I*, 537 U.S. at 328-29.

"First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race." *Id.* at 328. A defendant's burden at the first step "is not meant to be onerous." *Sorto v. Herbert*, 497 F.3d 163, 170 (2d Cir. 2007). A defendant satisfies this burden "by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Johnson I*, 3 F.4th at 1225 (quoting *Johnson v. California*, 545 U.S. 162, 170 (2005)).

---

[10] As the *Flowers* Court explains, *Batson* "now applies to gender discrimination, a criminal defendant's peremptory strikes, and to civil cases." 588 U.S. at 301. But the *Batson* challenge in this case involves only alleged racial discrimination.

"Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question." *Miller-El I*, 537 U.S. at 328. The prosecution's burden at the second step is minimal. The prosecution must produce a nondiscriminatory reason for striking a juror, and the proffered reason need not be "persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (*per curiam*); *see Johnson*, 545 U.S. at 171 ("[E]ven if the State produces only a frivolous or utterly nonsensical justification for its strike, the case does not end-it merely proceeds to step three."). Thus, "[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Hernandez v. New York*, 500 U.S. 352, 360 (1991) (plurality opinion)).

"Third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination." *Miller-El I*, 537 U.S. at 328-29. The defendant's burden at *Batson*'s third step is substantial. At this step, a defendant must persuade the court that, regardless of the race-neutral reason proffered by the prosecution, the actual reason for the challenged strike was racial discrimination. *See Purkett*, 514 U.S. at 768 (noting that "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike"). A court must consider "all of the circumstances that bear upon the issue of

racial animosity" in determining whether the defendant has met his burden to show purposeful discrimination. *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008). Evidence that may be probative of discriminatory intent includes, but is not limited to:

> • statistical evidence about the prosecutor's use of peremptory strikes against black prospective jurors as compared to white prospective jurors in the case;
>
> • evidence of a prosecutor's disparate questioning and investigation of black and white prospective jurors in the case;
>
> • side-by-side comparisons of black prospective jurors who were struck and white prospective jurors who were not struck in the case;
>
> • a prosecutor's misrepresentations of the record when defending the strikes during the *Batson* hearing;
>
> • relevant history of the State's peremptory strikes in past cases; or
>
> • other relevant circumstances that bear upon the issue of racial discrimination.

*Flowers*, 588 U.S. at 302 (bullet points in original). At *Batson*'s third step, a court "must consider the prosecutor's race-neutral explanations in light of all of the relevant facts and circumstances, and in light of the arguments of the parties," must assess "the prosecutor's credibility" and "demeanor," and "must determine whether the prosecutor's proffered reasons are the actual reasons, or whether the proffered reasons are pretextual and the prosecutor instead exercised peremptory strikes on the basis of race." *Id.* at 302-03.

## B. Standard and scope of review

Given the procedural posture of this case, this Court's review of the *Batson* claim is de novo.  *See Johnson I*, 3 F.4th at 1225 (holding that Johnson made the showings necessary to satisfy the standards in 28 U.S.C. § 2254(d) and to obtain de novo review of his *Batson* claim).  And, because the Tenth Circuit determined that Johnson satisfied *Batson*'s first step, this Court's review of the *Batson* claim concerns only the second and third.  *Id.* at 1226; *Johnson II*, 104 F.4th at 199, 202-03.

## C. Step two:  race-neutral reasons.

Johnson concedes that Respondent met its burden at *Batson*'s second step. [ECF No. 110 at 9.]  Based on the following findings of fact and conclusions of law, the Court finds that concession well-taken and concludes that the State satisfied its burden of production at *Batson*'s second step.

### <u>Findings of fact</u>

1.  During jury selection, the State and Johnson each had the opportunity to exercise nine peremptory challenges, and each had one additional peremptory challenge to excuse a prospective juror from the pool of alternate jurors.  [Resp. Ex. 2 at 219.]

2.  Harris and Drummond exercised the State's ten peremptory challenges as follows:  (1) Dr. Tawil, who is from Syria, is white, speaks Arabic as

his first language, and speaks fluent English; (2) Mr. Dickens, who is African-American, speaks English as his first language, and speaks proficient Spanish; (3) Ms. Aramburo de Wassom, who is Mexican, speaks Spanish as her first language, and speaks English as her second language; (4) Ms. Wilson, who is white and speaks English as her first language; (5) Ms. Carranza, who is white and speaks English as her second language; (6) Ms. Martinez, who is white and speaks English as her first language; (7) waived; (8) Ms. Nichols, who is American Indian and speaks English as her first language; (9) waived; and (10) Ms. Ismert, who is white and speaks English as her first language.  [Resp. Ex. 2 at 52-53, 219-25; ECF No. 107, Tr. Hr'g, at 162-63, 167-68, 170-72; Resp. Exs. 16, 18, 23, 26, 29, 39, 40, 42.][11]

3.  Johnson objected to the State's use of peremptory challenges to excuse Dr. Tawil, Mr. Dickens, Ms. Aramburo de Wassom, Ms. Carranza, and

---

[11] Frederick obtained information about members of the jury pool from a driver's license database and from asking members of the jury pool about their self-identified races, ethnicities, and languages spoken.  [ECF No. 107, Tr. Hr'g, at 157-58.]  Frederick could not reach Ms. Carranza.  [ECF No. 107, Tr. Hr'g, at 162.]  Ms. Carranza stated during jury selection that English is her second language but did not identify her first language.  [Resp. Ex. 2 at 52-53.]  Except for Ms. Carranza's race, drawn from her driver's license, the racial and ethnic identities listed here refer to the self-identified race and ethnicity of each prospective juror who was stricken.

Ms. Martinez, all of whom he perceived as minorities.  [Resp. Ex. 2 at 221.][12]

4.  Johnson did not object when the State used the State's eighth peremptory challenge to excuse Ms. Nichols.  [Resp. Ex. 2 at 224.][13]

5.  Before using the State's eighth peremptory challenge to excuse Ms. Nichols, Harris attempted to excuse Ms. Williams, who self-identifies as black and speaks English as her first language, but Judge Gillert did

_____

[12] Lyons twice referred to Ms. Carranza when asserting a *Batson* challenge.  [Resp. Ex. 2 at 221.]  In context, it appears he intended to say Ms. Martinez the second time because he asserted the challenge immediately after the State excused Ms. Martinez, and his challenge asserted "every" strike to that point (e.g., strikes one through six), except the fourth strike excusing Ms. Wilson, was of a minority.  [*Id.*]  Further, to the extent Lyons perceived that Ms. Martinez was a minority, evidence developed in this habeas proceeding shows that she self-identifies and is described on her driver's license as white.  [ECF No. 107, Tr. Hr'g, at 167; Resp. Ex. 26.]  Nevertheless, Johnson's *Batson* challenge rests, in part, on the strike of Ms. Martinez.  And the Tenth Circuit treated Ms. Martinez as a minority juror for purposes of finding a prima facie case of discrimination at *Batson*'s first step and in determining that the State should be permitted to proffer a race-neutral reason for her strike.  *Johnson II*, 104 F.4th at 196-97, 199-200; *Johnson I*, 3 F.4th at 1219-20, 1225-27.  For these reasons, the Court includes Ms. Martinez in its second step analysis.

[13] It does not appear that Johnson has ever identified Ms. Nichols, an American Indian, as an impermissibly stricken minority prospective juror.  But the record demonstrates that she is a minority and that the State used a peremptory challenge to excuse her.  Regardless of whether Johnson acknowledges these facts, he has repeatedly argued that Harris and Drummond used the State's peremptory challenges to excuse nearly "every" minority prospective juror and that the State actually excused five minority prospective jurors.  For these reasons, the Court includes Ms. Nichols in its second step analysis.

not permit the strike of Ms. Williams, explaining that by excusing her, the State "would have effectively eliminated all the African Americans." [Resp. Ex. 2 at 223.][14]

6.  Harris testified he excused Dr. Tawil because he was a physician with an advanced degree; Dr. Tawil and a second prospective juror, Dr. Wilson, knew each other; Harris perceived tension between Dr. Tawil and Dr. Wilson during an exchange between the two that occurred after Dr. Tawil did not recognize Dr. Wilson as his former attending physician; and Dr. Tawil's facial expression during Lyons's portion of *voir dire* made it appear to Harris as though Dr. Tawil had prejudged the State's evidence.  [ECF No. 107, Tr. Hr'g, at 90-92, 123-24.]

7.  Drummond stated during jury selection that he excused Mr. Dickens because "he has a Ph.D."; the State was "concerned about him being a professor of liberal arts"; and it was Drummond's practice "to not keep

---

[14] Johnson appears to rely on the attempted strike of Ms. Williams primarily to support his third step burden to show purposeful discrimination. [ECF No. 8 at 13-17; ECF No. 110 at 12.]  The Court nonetheless considers at the second step whether the State proffered a race-neutral reason for attempting to excuse Ms. Williams because the Court must consider all relevant circumstances at the third step and the attempted strike of Ms. Williams is a relevant circumstance, the weight of which may be influenced by the existence, if any, of a race-neutral reason.

those type[s] of educated people, Ph.D.'s in liberal arts, on the jury"
because "they're too exacting at times, too liberal." [Resp. Ex. 2 at 220.]

8.  Harris testified he excused Ms. Aramburo de Wassom because English
was not her first language; Harris perceived that her language
difficulties would be problematic in a conspiracy case; and he was
"stunned" when Judge Gillert denied his challenge to excuse her for
cause based on Harris's view that she had difficulty understanding
English. [ECF No. 107, Tr. Hr'g, at 94-96.]

9.  Harris testified he excused Ms. Carranza because he "didn't like the job
that she was in" because it appeared to him that she worked in an
assembly position that did not require decision making; she "struggl[ed]
with the English language"; and an exchange between Lyons and
Carranza during *voir dire* indicated to Harris she may have prejudged
some of the State's witnesses who had criminal backgrounds. [ECF No.
107, Tr. Hr'g, at 97-99.]

10.  Harris testified he excused Ms. Martinez because she had been
called for jury service "five previous times," "her attitude and her tone"
demonstrated she did not want to participate in jury service, and she
had a brother with a criminal record and her responses to Harris's
questions indicated to Harris that she had "a bone to pick and a burr

under her saddle regarding what happened to her brother in the criminal justice system." [ECF No. 107, Tr. Hr'g, at 99-101.]

11.   Harris testified he excused Ms. Nichols because she was retired and retirees often make a trial "the focal point of everything that they have going on in their lives" which could "disrupt the deliberations and [Ms. Nichols's] view of the evidence." [ECF No. 107, Tr. Hr'g, at 103-04.]

12.   Harris stated during jury selection and testified that he attempted to excuse Ms. Williams because she is a pastor, he views pastors as "very forgiving" and as having "trouble with judgment," and she had "worked with drug addicts and counseled them in the past showing the State of Oklahoma a propensity towards treatment rather than judgment." [Resp. Ex. 2 at 223-24; ECF No. 107, Tr. Hr'g, at 103, 171.]

## Conclusions of law

Based on the foregoing, the Court concludes the State produced race-neutral reasons during jury selection for excusing Mr. Dickens, an English professor, and for attempting to excuse Ms. Williams, a pastor. *See Felkner v. Jackson*, 562 U.S. 594, 595 (2011) (educational background; social work experience); *United States v. Golden*, 781 F. App'x 798, 803 (10th Cir. 2019) ("It is not unusual for prosecutors to be skeptical of potential jurors who have shown unusual sympathy for those who have had troubled lives."); *Ngo v. Giurbino*, 651 F.3d 1112, 1117 (9th Cir. 2011) (finding strike of "overly

15

educated" juror race-neutral); *United States v. Maxwell*, 473 F.3d 868, 872 (8th Cir. 2007) ("The inference that a juror's employment might make the juror more sympathetic to a criminal defendant is a valid, race-neutral reason for striking a juror."); *United States v. Nelson*, 450 F.3d 1201, 1208 (10th Cir. 2006) ("There is no racially discriminatory intent inherent in the prosecutor's explanation of why she thought teachers or other highly educated persons do not make good jurors."); *Hall v. Luebbers*, 341 F.3d 706, 713 (8th Cir. 2003) (noting that "[o]ccupation is a permissible reason to defend against a Batson challenge"); *Martinez v. Schriro*, No. CV-05-1561-PHX-EHC, 2008 WL 783355, at * 16 (D. Ariz. Mar. 20, 2008) (unpublished) ("forgiving nature of pastor" deemed race-neutral).

The Court further concludes that the State produced race-neutral reasons during the reconstruction hearing for excusing Ms. Aramburo de Wassom, Ms. Carranza, Ms. Martinez, and Ms. Nichols. *See Davis v. Ayala*, 576 U.S. 257, 278 (2015) ("It is understandable for a prosecutor to strike a potential juror who might have difficulty understanding English."); *Ngo*, 651 F.3d at 1117 (education level); *Maxwell*, 473 F.3d at 872 (demeanor and body language); Hall, 341 F.3d at 713 (occupation); *United States v. Lewis*, 117 F.3d 980, 983 (7th Cir. 1997) (employment status); *United States v. Alvarado*, 951 F.2d 22, 24-25 (2d Cir. 1991) (age); *United States v. Rudas*, 905 F.2d 38,

41 (2d Cir. 1990) (inattentiveness and prior jury service); *Olivas v. Martel*, No. 11-00499 JST (PR), 2013 WL 3157864, at *12 (N.D. Cal. June 20, 2013) (unpublished)  (finding race-neutral prosecutor's concern that juror would be "unduly skeptical" of certain testimony); *Hypolite v. Adams*, No. CV 06-3921 ODW (FMO), 2009 WL 1683277, at * 14 (C.D. Cal. June 11, 2009) (unpublished) ("Courts have consistently held that a family member's criminal history is an acceptable, race-neutral reason for striking a prospective juror."); *Ruiz v. McKenzie*, 63 F. Supp. 2d 1290, 1293 (D. Kan. 1999) (upholding as race-neutral prosecutor's stated reason that three jurors had "mutual acquaintances" or appeared to know each other).

Because none of the reasons produced by the State is inherently discriminatory, the State has met its burden at *Batson*'s second step. *Purkett*, 514 U.S. at 768;  *Johnson*, 545 U.S. at 171; *Hernandez*, 500 U.S. at 360.

## D. Step three:  purposeful discrimination

Johnson contends he met his burden at *Batson*'s third step to show purposeful discrimination based on record evidence demonstrating:  (1) a pattern of striking and attempting to strike, minority prospective jurors [ECF No. 8 at 13-17; ECF No. 17 at 6-9; ECF No. 110 at 5, 11-12, 14]; (2) a history of racist "culture" in the Tulsa County District Attorney's Office [ECF No. 67

at 18-19; ECF No. 110 at 4-5, 10]; (3) "an undercurrent of racial tension" that flowed through Johnson's trial because Johnson and four other minorities were accused of killing a prominent white man [ECF No. 67 at 15-16; ECF No. 110 at 1-2, 8]; (4) Harris's personal animosity toward Johnson arising from Johnson's alleged involvement in a plot to kill Harris [ECF No. 67 at 15-17; ECF No. 110 at 2-4, 10-11]; and (5) the nonpersuasiveness of the State's race-neutral reasons produced by Harris at the reconstruction hearing [ECF No. 67 at 20-25; ECF No. 110 at 6-8, 11-14].  Based on the following findings of fact and conclusions of law, the Court concludes that Johnson has not satisfied his burden of persuasion at *Batson*'s third step.

### **Findings of Fact**

### **Pattern of strikes**

1. Johnson's jury pool comprised thirty-three prospective jurors with the following racial/ethnic makeup:  (a) twenty-nine were white;  (b) of those twenty-nine white prospective jurors, seven self-identified as having a distinct ethnicity or as biracial:  one self-identified as Hispanic (Mr. Perez), three self-identified as American Indian and white (Mr. Simmons, Mr. Squires, and Ms. Ziegler), one self-identified as Mexican (Ms. Aramburo de Wassom), one self-identified as Filipino and white (Dr. Wilson), and one self-identified as Syrian (Dr. Tawil); (c) three prospective jurors self-identified as either African-American (Mr.

Dickens and Ms. Sweet) or black (Ms. Williams); (d) and one prospective juror self-identified as American Indian (Ms. Nichols).[15] [ECF No. 107, Tr. Hr'g, at 161-73; Resp. Exs. 12-44.]

2. Harris and Drummond (a) waived two of the State's ten peremptory challenges; (b) used five of eight peremptory challenges (62.5% of challenges used) to excuse minority prospective jurors (Dr. Tawil, Mr. Dickens, Ms. Aramburo de Wassom, Ms. Carranza, and Ms. Nichols); and (c) used three of eight peremptory challenges (37.5% of challenges used) to excuse nonminority prospective jurors (Ms. Wilson, Ms.

---

[15] Frederick was unable to contact four members of the jury pool (Ms. Carranza, Mr. McDaniels, Ms. Rap, and Ms. Roper), all of whom are identified as white on their driver's licenses. [ECF No. 107, Tr. Hr'g, at 162, 167, 169.] The Court thus has no information regarding whether these prospective jurors self-identify as having a race different from that listed on a driver's license, as having distinct ethnicity, or as biracial. As previously noted, Ms. Carranza stated during *voir dire* that English is her second language, and Johnson perceived Ms. Carranza as a minority in making his *Batson* challenge. *See supra*, n.10.

19

Martinez, and Ms. Ismert).[16]  [Resp. Ex. 2 at 219-25; ECF No. 107, Tr. Hr'g, at 162-63, 167-68, 170-72; Resp. Exs. 16, 18, 23, 26, 29, 39, 40, 42.]

3. Harris attempted to excuse a different minority prospective juror, Ms. Williams, before excusing Ms. Nichols, and Judge Gillert did not permit the strike of Ms. Williams, noting that the State "would have effectively eliminated all the African Americans."  [Resp. Ex. 2 at 223-24.]

4. When Judge Gillert gave the prosecutors the opportunity to excuse either a minority prospective juror, Ms. Sweet, or a nonminority prospective juror, Ms. Ismert, from serving as an alternate juror, Drummond excused Ms. Ismert.  [Resp. Ex. 2 at 224-25.]

5. Johnson's twelve-person jury included eight white jurors (Mr. Ary, Ms. Barlow, Ms. Cavender, Mr. McDaniels, Ms. Messick, Ms. Petersen, Mr. Spitzer, and Ms. Huff), one black juror (Ms. Williams), one Hispanic

---

[16] This Court previously noted its reasons for including Ms. Martinez in its analysis of *Batson*'s second step.  *See supra*, n.12.  And this Court has accepted as race-neutral the State's proffered reasons for excusing Ms. Martinez.  *See supra*, section II.C.  But the Court finds no purpose would be served at *Batson*'s third step by ignoring the undisputed evidence that Ms. Martinez is not a racial or ethnic minority.  The Court further finds that no third step analysis would be complete by ignoring the fact that, despite any confusion about Ms. Martinez's race, the prosecutors did strike a total of five minority prospective jurors when they used the State's eighth strike to excuse Ms. Nichols after Judge Gillert disallowed the strike against Ms. Williams.  *See supra*, nn.13-14.

juror (Mr. Perez), and two American Indian/white jurors (Mr. Simmons and Mr. Squires).  [Resp. Ex. 2 at 225-26; Resp. Exs. 12-13, 17, 22, 27-28, 31-32, 35-37, 41]

6. Two prospective jurors served as alternate jurors:  one African-American juror (Ms. Sweet) and one white juror (Ms. Malsam).  [Resp. Ex. 2 at 225-26; Resp. Exs. 25, 38.]

**Tulsa County District Attorney's Office**

7. Judge Gillert, Harris, Drummond, and Lyons each had experience working as prosecutors for the Tulsa County District Attorney's Office. [ECF No. 107, Tr. Hr'g, at 12-13, 55, 137-38, 176.]

8. Judge Gillert worked at the Tulsa County District Attorney's Office between 1973 and 1977 and between 1983 and 1995 and served as a Tulsa County district judge until he retired in 2014.  [ECF No. 107, Tr Hr'g, at 137-38, 151-52.]

9. In his experience as a prosecutor with the Tulsa County District Attorney's Office and as a Tulsa County district judge presiding over criminal trials litigated by prosecutors from the Tulsa County District Attorney's Office, including those litigated by Harris and Drummond, Judge Gillert was not aware of anything "that would be negative or derogatory about the office" regarding *Batson* issues.  [ECF No. 107, Tr. Hr'g, at 139-44.]

21

10.    Harris spent twenty-eight years with the Tulsa County District Attorney's Office and served as the Tulsa County District Attorney between 1999 and January 2015.  [ECF No. 107, Tr. Hr'g, at 55.]

11.    Harris did not recall hosting any formal in-house training sessions on *Batson* but he was sure *Batson* was a topic of informal discussions. [ECF No. 107, Tr. Hr'g, at 55-56.]

12.    Harris denied that the office had a policy of striking minority prospective jurors and testified that such a policy "would never have been condoned under [his] administration or [his] leadership."  [ECF No. 107, Tr. Hr'g, at 56.]

13.    Drummond began working at the Tulsa County District Attorney's Office in 1997, became the first assistant district attorney in 2002, and left the office in 2015, when he became a Tulsa County district judge. [ECF No. 107, Tr. Hr'g, at 12.]

14.    Drummond did not recall any in-house training sessions on *Batson* between 2002 and 2015, and he testified that the Tulsa County District Attorney's Office had no policy regarding striking minority prospective jurors.  [ECF No. 107, Tr. Hr'g, at 12-15.]

15.    Lyons worked as an assistant district attorney for the Tulsa County District Attorney's Office between 1980 and June 1986 and did not

22

recall if *Batson* "ever came up" during that time.  [ECF No. 107, Tr. Hr'g, at 176, 179.][17]

16.    Between 1980 and 1986, Lyons overheard derogatory and racist language used at the Tulsa County District Attorney's Office, mainly by law enforcement officers who visited office, and he perceived that "young prosecutors" were impressed by the officers' language and adopted that language in referring to cases involving black defendants. [ECF No. 107, Tr. Hr'g, at 180-82, 194-96.]

17.    Lyons testified his general impression of the Tulsa County District Attorney's Office, between 1980 and 1986, was that the office "wasn't openly hostile towards blacks, but it was just expected that . . . they were prosecuted heavily."  [ECF No. 107, Tr. Hr'g, at 180-82, 194-96.]

18.    Lyons testified he also had the impression that "the idea was that you - - you kick blacks off of juries if a black was . . . a defendant," but Lyons could not cite "a specific incident" or identify "any name of anybody that says that happened."  [ECF No. 107, Tr. Hr'g, at 182-83.]

---

[17] The Supreme Court issued the *Batson* decision in April 1986.  476 U.S. at 79.

19.    Lyons testified that no person at the Tulsa County District Attorney's Office ever instructed him to exercise a peremptory challenge based on race.  [ECF No. 107, Tr. Hr'g, at 196.]

**Racial aspects of Johnson's trial**

20.    Johnson is African-American.  [ECF No. 107, Tr. Hr'g, at 46.]

21.    All of Johnson's co-conspirators were racial or ethnic minorities.  [ECF No. 107, Tr. Hr'g, at 46, 119.]

22.    Sweeney, the murder victim, was white.  [ECF No. 107, Tr. Hr'g, at 45-46.]

23.    Johnson's case was "high-profile" and garnered media attention because Sweeney was a prominent Tulsa businessman, there were three separate trials for Johnson and two co-defendants, and the facts of the case were unusual because Bethel shot Sweeney in broad daylight in Sweeney's office.  [ECF No. 107, Tr. Hr'g, at 45-46, 64-65, 155, 183-84, 203.]

24.    Drummond testified he did not perceive any racial overtones in Johnson's case and did not "see any of that in the media."  [ECF No. 107, Tr. Hr'g, at 46.]

25.     Lyons testified he perceived racial overtones in Johnson's case but "nobody specifically said [Johnson's] prosecution was race based" and

Lyons "can't point to anything that is direct evidence of it." [ECF No. 107, Tr. Hr'g, at 184.]

26.    Morgan worked as Lyons's paralegal for ten years, helped him prepare for Johnson's trial, and attended the trial. [ECF No. 107, Tr. Hr'g, at 201-02.]

27.    Morgan testified she felt "high tensions" in the "packed" courtroom during Johnson's trial and that she saw and felt "racial division" in the courtroom "based on both sides of the families" and where people from the community were seated in the gallery. [ECF No. 107, Tr. Hr'g, at 203-09.]

**Harris's alleged personal animosity toward Johnson**

28.    In 2010, the Tulsa Police Department informed Harris that two men Harris previously prosecuted, Phillip Summers and Demonte Bell, were plotting to kill him and that Johnson, who was then housed at the Tulsa County Jail with Summers and Bell, might be involved in the plot. [ECF No. 107, Tr. Hr'g, at 47-49, 65-66, 120-22.]

29.    For roughly three months, Harris had a security detail and changed his daily routines, and he wore a protective vest for longer than that. [ECF No. 107, Tr. Hr'g, at 47-49, 121-22.]

30. Harris took the threat against his life seriously but considered it resolved in 2011, when Summers and Bell were indicted, and Johnson was not. [ECF No. 107, Tr. Hr'g, at 47-49, 66-67, 120-22.]

31. Drummond and Harris both testified that they did not let Johnson's potential involvement in the threat against Harris's life affect how they prosecuted Johnson's case. [ECF No. 107, Tr. Hr'g, at 48-49, 125-26.]

32. Harris offered plea deals to two of Johnson's co-defendants, Aziz and Allen. [ECF No. 107, Tr. Hr'g, at 20, 118-20.]

33. Lyons testified that neither Harris nor Drummond would talk about any sort of plea deal with Johnson, and Lyons thought this was unusual because "most cases are plea bargained" and Johnson was "the least involved and the least culpable person." [ECF No. 67-1 at 17, 47, 49, 58 (Lyons Depo.); ECF No. 107, Tr. Hr'g, at 186-87.]

34. Harris testified that he and Drummond "approached Mr. Lyons, and he didn't want any kind of cooperation with the State whatsoever," and the State had secured two other cooperating co-conspirators, Allen and Aziz. [ECF No. 107, Tr. Hr'g, at 120.]

35. Lyons testified, based on "many years of being an attorney," that he thought Johnson's case "stunk . . . all the way from the beginning to the end," and he identified the absence of plea offers from the State and Harris's perceived response to Johnson's potential involvement in the

threat against Harris's life as two bases for that opinion.  [ECF No. 107, Tr. Hr'g, at 184.][18]

## Persuasiveness of race-neutral reasons

36.    Drummond remembered Johnson's case because the victim was a well-known businessman in Tulsa; he and Harris tried the case three times through separate trials for Johnson and two co-defendants; and Johnson's case involved a complex conspiracy charge which is a rare legal issue in state court.  [ECF No. 107, Tr. Hr'g, at 19, 45.]

37.    Drummond's general approach to jury selection was to select as jurors blue-collar workers, small business owners, insurance adjusters, or "[p]eople who have to make decisions about personnel matters" and to excuse prospective jurors who possess advanced degrees, because

---

[18] At the reconstruction hearing, Lyons attempted to explain why he believed Johnson's case had "that stink factor," but Lyons did so through a relatively lengthy narrative about police corruption cases with no readily apparent nexus to Johnson's trial or his *Batson* claim.  [ECF No. 107, Tr. Hr'g, at 184-85.]  At his deposition, taken during the discovery period following the first remand, Lyons identified things about Johnson's case that "stunk" as including the "unusual" failure of the prosecutors to extend plea offers to Johnson, searches of Johnson's jail cell by officials at the Tulsa County Jail, Lyons's perception that Johnson's possible involvement in the threat against Harris's life affected Harris's prosecution of Johnson, and what Lyons described as the "culture" of the Tulsa County District Attorney's Office getting unnamed "criminal judges" to sign off on motions to add new witnesses to Informations.  [ECF No. 67-1 at 39-58 (Lyons Depo.).]

they may be "too exacting," and pastors or overly religious types.  [ECF No. 107, Tr. Hr'g, at 16-18.]

38.    Drummond refreshed his memories of the jury selection process in Johnson's case by reviewing contemporaneous notes and *voir dire* transcripts.  [ECF No. 107, Tr. Hr'g, at 36, 44-45, 50, 52.]

39.    Drummond testified he did not independently recall the State's reasons for striking any prospective jurors, but he was unequivocal that "it wasn't anything about race" and that race "was never discussed." [ECF No. 107, Tr. Hr'g, at 37, 52.]

40.    Drummond generally recalled looking for jurors who would listen "objectively" to Aziz, a co-conspirator turned State's evidence, and who could understand the "tricky" concept of conspiracy.  [ECF No. 107, Tr. Hr'g, at 20-21.]

41.    In an August 2012 email to Harris, Drummond listed the following as potential issues to consider during jury selection:  (1) ability to understand conspiracy, (2) ability to listen to "[p]roblematic witnesses" with felony convictions or pending charges, "[r]eluctant witnesses," and testifying co-defendant Aziz; and (3) ability to consider "[t]ranscript v. live witness," circumstantial evidence, and witness credibility.  [ECF No. 107, Tr. Hr'g, at 20-21; Resp. Ex. 4.]

42.    Drummond used question marks on a jury chart during *voir dire* to indicate he had seen or heard a potential reason to strike a prospective juror; used plus signs to indicate he had seen or heard a potential reason to select a prospective juror; and, for each prospective juror, he noted "probably the most important things he looks at during jury selection:  occupation, occupation of spouse, prior jury service, and area of town where the prospective juror lives.  [ECF No. 107, Tr. Hr'g, at 22-35; Resp. Ex. 3.]

43.    Harris remembered Johnson's case as the only case that he tried three times and that involved a conspiracy charge; and as a factually unique case because it involved a murder-for-hire plot to kill a well-known businessman, the murder occurred in the early morning in Sweeney's office, and, in his view, the murder "stunned the community."  [ECF No. 107, Tr. Hr'g, at 64-65, 72, 117-18.]

44.    Harris's general approach to jury selection was to avoid jurors with advanced degrees, physicians, those with prior jury service, those who were retired, those who knew each other, and those who had been arrested by the Tulsa Police Department or Tulsa County Sheriff's Office or who had family members who had been arrested or prosecuted in Tulsa County.  [ECF No. 107, Tr. Hr'g, at 62-64, 77-78, 103, 129-30.]

45.    Harris generally tried to select jurors who were good decision-
makers or were used to making personnel decisions at work; who would
view jury service "as a job" and "look for the truth"; and who would give
the State "a level playing field."  [ECF No. 107, Tr. Hr'g, at 62-63.]

46.    Harris testified he independently recalled the State's reasons for
striking some prospective jurors and refreshed his memories by
reviewing his contemporaneous notes and *voir dire* transcripts.  [ECF
No. 107, Tr. Hr'g, at 67-80, 90-105, 123-25, 128.]

47.    Harris's contemporaneous notes included general and specific
outlines for conducting *voir dire* and a pattern jury instruction on
conspiracy; mentioned his general strategies of selecting jurors who
were active listeners, could do "hard work" and make "decisions," would
be comfortable with determining guilt and deciding punishment, and
could set aside religious or philosophical beliefs; mentioned the
complexity of the conspiracy charge and problematic witnesses as
issues to consider in selecting jurors; and noted some responses
prospective jurors gave to questions posed by Lyons during *voir dire*.
[ECF No. 107, Tr. Hr'g, at 67-77; Resp. Exs. 6-9.]

48.    Harris used a "J" on his jury chart to indicate prior jury service;
used a red dot to indicate a prospective juror had heard about the case;
and took notes about each prospective juror's occupation and marital

status, and when he heard a response from a prospective juror that he wanted to follow up on.  [ECF No. 107, Tr. Hr'g, at 81-89; Resp Ex. 11b.]

49.    Lyons testified, based on his observations during jury selection, that the reasons Drummond and Harris offered for excusing Mr. Dickens and for attempting to excuse Ms. Williams were delivered in a "strained" or "weak" manner and without "confidence," and that it appeared to him from the prosecutors' body language that "it was a struggle" for them to produce race-neutral reasons for these strikes. [ECF No. 107, Tr. Hr'g, at 190, 199.]

50.    Morgan, Lyons's paralegal, testified that she recalled Lyons made "a bunch of challenges" during jury selection and that "some minorities . . . were being kicked off," contributing to the "racial division" she felt in the courtroom; that she "couldn't tell what was really going on as [she] was sitting there" during jury selection; and that she recalled nothing specific about any reasons given by the prosecutors during jury selection.  [ECF No. 107, Tr. Hr'g, at 204-07.]

51.    During jury selection, Judge Gillert accepted Drummond's reason for excusing Mr. Dickens as a race-neutral reason.  [Resp. Ex. 2 at 220.]

52.    Judge Gillert testified he disallowed the attempted strike of Ms. Williams because he felt it was important to include an African-

American on the jury even though he generally viewed the strike of a prospective juror who is "particularly religious" or "forgiving" as good trial strategy.  [ECF No. 107, Tr. Hr'g, at 150.]

53.     Judge Gillert testified, based on his experience in presiding over Johnson's case and the cases of Johnson's two co-defendants, that Harris and Drummond did not exercise any peremptory strikes with discriminatory intent.  [ECF No. 107, Tr. Hr'g, at 151.]

## Conclusions of law

This Court's task at Batson's third step is to "determine whether the [prosecutors'] proffered reasons are the actual reasons, or whether the proffered reasons are pretextual and the prosecutor[s] instead exercised peremptory strikes on the basis of race." *Flowers*, 588 U.S. at 303.  In performing this task, this Court "must consider the [prosecutors'] race-neutral explanations in light of all of the relevant facts and circumstances, and in light of the arguments of the parties." *Id.* at 302.

But it is Johnson's burden to persuade this Court that the State's race-neutral reasons are pretext for purposeful discrimination. *See Purkett*, 514 U.S. at 768 ("It is not until the third step that the persuasiveness of the justification becomes relevant-the step in which the trial court determines whether the opponent of the strike has carried his burden of proving

purposeful discrimination.").  And Johnson may rely on a "variety of evidence" to meet this burden.  *Flowers*, 588 U.S. at 302-03.

As previously stated, Johnson relies on five categories of evidence that he contends shows purposeful discrimination:  (1) the State's pattern of striking, or attempting to strike, minority prospective jurors; (2) an alleged history of racist "culture" in the Tulsa County District Attorney's Office; (3) an alleged "undercurrent of racial tension" that flowed through Johnson's trial; (4) Harris's alleged personal animosity toward Johnson; and (5) the alleged nonpersuasiveness of the State's race-neutral reasons produced by Harris at the reconstruction hearing.  For the following reasons, the Court is not persuaded.

**<u>Pattern of strikes</u>**

First, while the State's pattern of strikes against five minority prospective jurors supports an inference of purposeful discrimination, it does not show purposeful discrimination on the record presented.  *See Johnson I*, 3 F.4th at 1226 (concluding at *Batson*'s first step "that the clear pattern of strikes against five of six minority jurors [in Johnson's case] establishes an inference of discrimination"); *see also Cortez-Lazcano v. Whitten*, 81 F.4th 1074, 1083 (10th Cir. 2023) (noting "pattern" of strikes is relevant to Batson's third step).  A pattern sufficient to support a prima facie case at the first step "'does not

necessarily establish racial discrimination'" at the third step.  *Johnson I*, 3 F.4th at 1226 (quoting *Brinson v. Vaughn*, 398 F.3d 225, 235 (3d Cir. 2005)); *see United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1044 (110th Cir. 2005) (noting that "the number of persons struck takes on meaning only when coupled with other information such as the racial composition of the venire, the race of others struck, or the voir dire answers of those who were struck compared to the answers of those who were not struck).  And, in this case, the overall striking pattern is not compelling.  True, the State used more peremptory challenges to excuse minority prospective jurors (five) than it used to excuse nonminority prospective jurors (three).[19]  But the State also left two minority prospective jurors unchallenged, one of whom served as a juror (Mr. Perez) and one of whom served as an alternate juror (Ms. Sweet).

---

[19] In discussing the statistical evidence, Respondent also mentions the attempted strike of Ms. Williams as an attempt to excuse a sixth minority prospective juror.  [ECF No. 109 at 37.]  But the reality of the record evidence muddies the waters on this point.  Johnson's initial *Batson* challenge mistakenly included one nonminority prospective juror in the pattern of five strikes, Ms. Martinez, and in this proceeding Johnson suggests, in part, that the attempt to strike a sixth minority prospective juror, Ms. Williams, shows purposeful discrimination.  [ECF No. 110 at 12.]  But the evidence shows the State initially excused only four minority prospective jurors because Ms. Martinez is white.  Thus, the later failed attempt to excuse Ms. Williams would have been the fifth strike against a minority prospective juror, not the sixth, and the State ultimately used the fifth strike to excuse Ms. Nichols, also a minority prospective juror.  In short, on the record as it stands now, there is no evidentiary basis for the alleged attempt to excuse a "sixth" minority prospective juror.

And, albeit with Judge Gillert's intervention, Ms. Williams also served as a juror.  "Although the presence of [minority] jurors does not dispose of an allegation of race-based peremptory challenges, it is a significant factor tending to prove the paucity of the claim."  *United States v. Puentes*, 50 F.3d 1567, 1578 (11th Cir. 1995).  The inference raised by the striking pattern in this case does not withstand the reality of the record, support Johnson's assertion that the State used every opportunity it had "to strike every African-American and minority juror that [it] could," or show purposeful discrimination.  [ECF No. 110 at 11.]

Further, to the extent Johnson likens the statistical evidence in this case to evidence of the same kind in *Miller-El v. Dretke*, 545 U.S. 231 (2005) ("*Miller-El II*"), that comparison is unavailing.  In his brief in support of the petition, Johnson discussed the State's pattern of strikes, including, the attempt to strike Ms. Williams, and appeared to compare this case to *Miller-El II*, a case he described as granting habeas relief on a *Batson* claim "where the prosecutor used peremptory strikes on 10 out of 11 qualified African-American veniremen."  [ECF No. 8 at 13-17.]  The *Miller-El II* Court did describe a pattern of striking ten of eleven minority prospective jurors, or "91% of the eligible African-American venire members" as "remarkable."  *Miller-El II*, 545 U.S. at 240-41.  But the *Miller-El II* Court found additional

circumstances "[m]ore powerful than these bare statistics." *Id.* at 241.  In *Miller-El II*, the defendant also presented compelling evidence of purposeful discrimination through:  side-by-side comparisons of stricken minority prospective jurors and nonminority prospective jurors who served on the jury showing that purportedly race-neutral reasons provided by prosecutors to support striking minority prospective jurors "appeared equally on point as to some white jurors who served"; record evidence that the prosecutors' repeatedly used the Texas "jury shuffle" procedure each time black prospective jurors were seated at the front of the jury panel; record evidence of disparate questioning of black and nonblack prospective jurors; and testimony from former prosecutors employed by the Dallas County District Attorney's Office and a manual written in 1968 that remained in circulation in that office until 1976 and was available to at least one of the prosecutors in the defendant's case demonstrating "that for decades leading up to the time [the defendant's] case was tried prosecutors in the Dallas County office had followed a specific policy of systematically excluding blacks from juries." *Id.* at 241-66.

Several of these additional circumstances discussed in *Miller-El II* are either not discussed by Johnson or, if discussed, are not supported by record evidence.  For example, at no point in this habeas proceeding has Johnson

suggested that a comparative juror analysis reveals purposeful discrimination.  *See Miller-El II*, 545 U.S. at 241 ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step.").  The first step of a comparative juror analysis is to identify nonminority jurors who could have been stricken for similar reasons that were proffered by the State to strike minority prospective jurors.  In his brief in support of the petition, Johnson identified reasons that stricken minority prospective jurors would have made good jurors.  [ECF No. 8 at 14-15.]  He did not, however, identify any of the prosecutors' then-proffered reasons for striking minority prospective jurors that would apply just as well to an otherwise similar nonminority juror who served on his jury.  [ECF No. 8, at 13-17.]  Granted, when Johnson filed his brief, the only reasons produced by the State were those for Mr. Dickens and Ms. Williams.  But even after expansion of the habeas record, through post-remand discovery and a reconstruction hearing, wherein the State produced reasons for each strike Johnson has not identified any evidence relevant to a comparative juror analysis.  [ECF Nos. 67, 110.]  Respondent contends that a comparative juror analysis "reveals no disparate treatment."  [ECF No. 109 at 35-36.]  Respondent may be correct, but Johnson has not asked this Court to consider that analysis, and this

37

Court declines to scour the *voir dire* transcripts for comparator juror evidence to refute Respondent's position when Johnson himself has not attempted to do so.  It is Johnson's burden to show purposeful discrimination, and it is this Court's duty to consider all relevant circumstances, evidence, and arguments he presents to satisfy that burden.  *See Flowers*, 588 U.S. at 302 (noting that at *Batson*'s third step, a court "must consider the prosecutor's race-neutral explanations in light of all of the relevant facts and circumstances, and *in light of the arguments of the parties*" (emphasis added)).

Similarly, Johnson does not ask this Court to consider any evidence from the *voir dire* transcripts that might suggest purposeful discrimination based on disparate questioning of minority prospective jurors.  *See Flowers*, 588 U.S. at 310 ("[T]his Court's cases explain that disparate questioning and investigation of prospective jurors on the basis of race can arm a prosecutor with seemingly race-neutral reasons to strike the prospective jurors of a particular race."); *Batson*, 476 U.S. at 97 (noting that "the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose").  Again, this Court declines to trudge through the *voir dire* transcripts on a path Johnson could have taken to find potential evidence of disparate

questioning of minority and nonminority prospective jurors that might support Johnson's position that the State's strikes were racially motivated.

For these reasons, and for additional reasons discussed next, Johnson has not presented compelling evidence, beyond "bare statistics," to support his claim of purposeful discrimination.

## Tulsa County District Attorney's Office

Second, there is no credible evidence that the Tulsa County District Attorney's Office had a policy or practice of using peremptory challenges to excuse minority prospective jurors during the time relevant to Johnson's jury selection process, during Harris's tenure as District Attorney, or during Drummond's tenure as a first assistant district attorney. *See Flowers*, 588 U.S. at 300, 302, 304 (noting that a defendant may present "relevant history of the State's peremptory strikes in past cases"); *Miller-El II*, 545 U.S. at 263-64 (discussing evidence that Dallas County District Attorney's Office had a policy of striking minority prospective jurors "for decades"). Judge Gillert, Harris, and Drummond, all of whom served in supervisory positions between the mid-1980s and 2015, credibly testified that the Tulsa County District Attorney's Office did not have a policy of instructing, training, or permitting prosecutors from that office to use peremptory challenges based on race. Johnson's only evidence suggesting otherwise is Lyons's anecdotal evidence

from his six-year, mostly pre-*Batson* stint as an assistant district attorney, that racist language was used in the office by law enforcement officers and was sometimes adopted by some prosecutors who were impressed with that language. Even crediting Lyons's impressions from the 1980s, Lyons admitted that no one in the Tulsa County District Attorney's office ever instructed him to exercise racially motivated strikes and that he could not identify any specific instances where anyone from that office exercised racially motivated strikes.

Further, there is no credible evidence that either Harris or Drummond had a reputation for, or history of, exercising racially motivated strikes. Drummond credibly testified he was familiar with *Batson*, he has never had a practice of exercising racially motivated strikes, he did not know that to be Harris's practice, and he did not consider race when striking prospective jurors for Johnson's trial. Harris credibly testified that he is familiar with *Batson*, that he had never exercised a racially motivated strike to excuse a prospective juror, that he had never known Drummond to do so. And Judge Gillert credibly testified he was not aware of any instances, either before or during the three trials of Johnson and his two minority co-defendants, involving the exercise of a racially motivated peremptory challenge by Harris or Drummond.

Considering the entirety of testimony about the policies and practices of the Tulsa County District Attorney's Office, in general, and the reputations and practices of Harris and Drummond, specifically, there is no credible evidence that the office or the prosecutors in Johnson's case had a reputation for exercising racially motivated peremptory challenges during the time relevant to Johnson's jury selection process.

## Racial aspects of trial and Harris's personal animosity

Johnson's third and fourth categories of evidence require little discussion, so the Court addresses them together.  Put simply, no credible evidence supports that the State purposefully discriminated against minority prospective jurors either because there was a "racial aspect" to Johnson's trial or because Harris allegedly had personal animosity toward Johnson.

Johnson appears to assert the "racial aspect" of his trial—namely, that the State prosecuted minority co-defendants for the murder of a white victim—demonstrates the State used racially motivated strikes against prospective minority jurors.  [ECF No. 110 at 110 at 1-2, 10.]  No one disputes that Johnson and his co-defendants are (or, in Allen's case, were) racial or ethnic minorities and that Sweeney was white.  But beyond that undisputed evidence, there is no credible evidence to support Johnson's assertion. Drummond credibly testified he neither perceived racial overtones in

41

Johnson's case nor observed that race was a prominent theme in the media coverage of Johnson's trial.  Lyons testified he perceived racial overtones but also admitted he had no direct evidence that Johnson's prosecution was racially motivated.  Finally, Morgan testified she perceived "racial division" in the courtroom based on where people were seated in the courtroom and because "some minorities were being kicked off" during a jury selection process she only vaguely recalled.  On this record, there is no credible evidence that any purported "racial aspect" of Johnson's trial substantially motivated the prosecutors to strike minority prospective jurors based on race and in violation of *Batson*.

Likewise, there is no credible evidence that Harris's had personal animosity toward Johnson, much less that any alleged animosity influenced the jury selection process.  There is credible evidence that Harris and Drummond believed Johnson may have been involved in a plot with other Tulsa County inmates to kill Harris before Johnson's trial.  Harris credibly testified that he took the threat against his life seriously and that it briefly disrupted his daily routine before Johnson's trial.   But he also credibly testified he considered the matter resolved in 2011, when Summers and Bell were indicted, and he questioned whether Johnson was even involved in the plot because Johnson was not indicted.  Further, Drummond and Harris both

credibly testified that they did not let Johnson's potential involvement in the threat against Harris's life affect how they prosecuted Johnson's case. Johnson's only evidence to counter this evidence is Lyons's testimony opining that the State's failure to extend plea offers to Johnson and other aspects of his prosecution, unrelated to jury selection, in Lyons's word, stunk.  Harris credibly testified that the State reached out to Johnson before trial to obtain his cooperation, that Lyons expressed no interest in cooperation, and that the State ultimately secured cooperation from two of Johnson's co-defendants. On this record, there is no credible evidence that Harris had personal animosity arising from the threat on Harris's life, let alone any personal animosity that influenced the jury selection process.

**Persuasiveness of reconstructed reasons**

Fifth, and contrary to Johnson's position, there is abundant evidence supporting the persuasiveness of the State's race-neutral reasons.  The race-neutral reasons produced during jury selection and the reconstruction hearing are consistent with and do not rest on misrepresentations of the record.  *See Flowers*, 588 U.S. at 302 (identifying "a prosecutor's misrepresentations of the record when defending the strikes during the *Batson* hearing" as evidence that may support a *Batson* claim)  As Respondent explains, the *voir dire* transcripts show:  the interaction Harris

43

describes between Dr. Tawil and Dr. Wilson [Resp. Ex. 2 at 57-58]; Mr. Dickens identification of himself as an English professor and his description of his work as a teacher and researcher [Resp. Ex. 1 at 31; Resp. Ex. 2 at 78-79];[20] statements from Ms. Aramburo de Wassom and Ms. Carranza identifying English as their second language, from Ms. Aramburo de Wassom expressing her belief that she did not "speak really good English" and does not understand "some words," and statements from both agreeing they would raise their hands at trial if they did not understand something that was said [Resp. Ex. 2 at 50-54, 128]; Ms. Nichols's statements describing herself as a retired nurse and discussing her prior experiences in geriatric and pediatric settings [Resp. Ex. 1 at 33-34; Resp. Ex. 2 at 88-89]; and Ms. Williams's identification of herself as a pastor with a sociology degree and discussion of

---

[20] As *Flowers* acknowledges, "the job of enforcing *Batson* rests first and foremost with trial judges." 588 U.S. at 302. Judge Gillert was in the best position to consider demeanor and credibility as to the race-neutral reasons Drummond gave for excusing Mr. Dickens. *See id.* at 303 ("The trial judge's assessment of the prosecutor's credibility is often important."); *Snyder*, 552 U.S. at 477 (noting that, in an ordinary *Batson* scenario, the "trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor"). Judge Gillert, who was present for the entirety of voir dire and knew the prosecutors well credibly testified that he did not view the strike of Mr. Dickens as racially motivated. [ECF No. 107, Tr. Hr'g, at 151-52.] The Court credits Judge Gillert's testimony and finds no credible evidence in the record to undermine it.

her counseling work with drug addicts.  [Resp. Ex. 1 at 35 Resp. Ex. 2 at 114-18.].  There is no indication in this case that the prosecutors misstated or misrepresented the record in stating their race-neutral reasons.[21]

Further, and even more compelling to this Court, the State's race-neutral reasons for excusing minority prospective jurors are consistent with the prosecutor's contemporaneous notes, their testimony about their general jury selection strategies, and have some basis in accepted trial strategy.  *See Miller-El I*, 537 U.S. at 339 (noting the credibility of reasons given can be measured by "how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy").  Both Drummond and Harris credibly explained that the State was seeking attentive jurors who would be able to receive evidence with an open mind, including circumstantial evidence and evidence from problematic or unavailable witnesses, and who could grasp the complex theory of a

---

[21] In the unique context of a *Batson* reconstruction hearing, "where a prosecutor can generally recall the trial, review contemporaneous notes, and articulate race-neutral explanations for the challenged strikes, the issue of intent is," at *Batson*'s third step, "well within the province of the [district] court." *Harris v. Haeberlin*, 752 F.3d 1054, 1059 (6th Cir. 2014).  The Court credits the testimony from both prosecutors that they remember Johnson's trial and have refreshed their memories by reviewing notes and *voir dire* transcripts.  But when memories are refreshed by review of transcripts, the argument that a prosecutor has not misrepresented the record in articulating race-neutral explanations is less compelling.

conspiracy.  Excusing prospective jurors with difficulty understanding English, those with less experience in decision-making roles, those who expressed skepticism with certain testimony that might be presented at trial, or those who have advanced degrees and might overanalyze the evidence or nitpick complex jury instructions is compatible with these stated jury selection strategies.

Notably, Drummond's and Harris's contemporaneous notes and jury charts, the latter of which were supplemented by their credible explanations of symbols and shorthand they used, do not suggest their use of the State's peremptory challenges was substantially motivated by race. *Contra Foster v. Chatman*, 578 U.S. 488, 493-95 (describing notations in documents obtained from prosecutors' jury selection files and concluding that "the focus on race in the prosecution's file plainly demonstrates a concerted effort to keep black prospective jurors off the jury," specifically, the use of a letter "N" to signify black prospective jurors, a list of "definite NO's" that included the names of each black prospective juror, and an affidavit from the prosecution's investigator identifying the name of "one of the black jurors" who "might be okay").  As discussed, the contemporaneous notes and jury charts in this case revealed the prosecutors' considerations of prospective jurors' occupations, prior jury service, and responses to questions posed during *voir dire*.

The arguments Johnson does raise to challenge the persuasiveness of the State's race-neutral reasons are themselves unpersuasive. Johnson, in part, speculates that the State's proffered race-neutral reasons are pretext for purposeful discrimination because Harris and Drummond briefly conferred before exercising each peremptory challenge and those real-time conferences were "off-the-record" so there is no evidence that they did not discuss race during those conferences. [ECF No. 110 at 6; ECF No. 107, Tr. Hr'g, at 43-44, 112.] But there is nothing inherently nefarious about co-counsel conferring with each other during jury selection. In any event, as previously discussed, other credible record evidence weighs heavily against purposeful discrimination.

And contrary to Johnson's argument, Harris's testimony about the State's race-neutral reasons for excusing minority prospective jurors is credible despite the passage of time. [ECF No. 110 at 13-14.] *See Harris*, 752 F.3d at 1059 ("[W]here a prosecutor can generally recall the trial, review contemporaneous transcripts of notes, and articulate race-neutral explanations for the challenged strikes, the issue of intent is . . . well within the province of the [district] court."). Harris credibly testified that he remembered Johnson's trial based on the nature of the crime and the fact that he prosecuted the case three times between the trials of Johnson and

two of his co-defendants.  Harris further credibly testified that his ability to identify the reasons for striking minority prospective jurors was the product of the combination of his independent recollection of jury selection and his review of his contemporary notes and the voir dire transcripts.  Nothing in the record suggests the passage of time prevented Harris from articulating the State's actual reasons for striking minority prospective jurors.

And while Johnson's passage of time argument focuses on Harris because Drummond did not offer any race-neutral reasons at the reconstruction hearing, the Court finds it appropriate to also consider the persuasiveness of Drummond's stated reasons for striking Mr. Dickens.  However, as *Flowers* acknowledges, in most cases "the job of enforcing *Batson* rests first and foremost with trial judges."  588 U.S. at 302.  In this case, Judge Gillert was in the best position to consider Drummond's demeanor and credibility regarding the strike of Mr. Dickens.  *See id.* at 303 ("The trial judge's assessment of the prosecutor's credibility is often important."); *Snyder*, 552 U.S. at 477 (noting that, in an ordinary *Batson* scenario, the "trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor").  Judge Gillert, who was present for the entirety of *voir dire* and knew both

prosecutors well credibly testified that he did not view the strike of Mr. Dickens as racially motivated.  [ECF No. 107, Tr. Hr'g, at 151-52.]  The Court credits Judge Gillert's testimony and finds no credible evidence in the record to undermine it.

## IV. Conclusion

Ultimately, other than statistical evidence showing the State struck more minority prospective jurors than nonminority prospective jurors, the only credible and reliable evidence presented to this Court points away from purposeful discrimination.  This is not a case where the State had an established policy (or a written manual) advocating the striking of minority prospective jurors based on race, *Miller-El II*, 545 U.S. at 264, where the State exhibited dramatic disparate treatment toward minority prospective jurors, *Flowers*, 588 U.S. at 288, or where the prosecutors' contemporaneous jury selection files plainly demonstrated discriminatory intent, *Foster*, 578 U.S. at 495.

Following de novo review of Johnson's *Batson* claim, the Court concludes that the State produced race-neutral reasons for each use of the State's peremptory challenges to excuse five minority prospective jurors.  The Court further concludes that Johnson did not present persuasive evidence showing that State's race-neutral reasons were pretext for purposeful discrimination.

For these reasons, the Court denies Johnson's request for federal habeas relief on the *Batson* claim and DENIES his petition.  In addition, because reasonable jurists would not debate the correctness of this Court's assessment of the *Batson* claim, the Court DENIES a certificate of appealability.  28 U.S.C. § 2253(c); *see Miller-El I*, 537 U.S. at 335-38 (discussing standard for issuing certificate of appealability).

**IT IS THEREFORE ORDERED** that the petition [ECF No. 1] is DENIED; a certificate of appealability is DENIED; and a separate judgment shall be entered in this matter.

**IT IS FURTHER ORDERED** that the Clerk of Court shall note on the record the substitution of Scott Tinsley, Interim Warden, in place of David Rogers as party Respondent.

**IT IS SO ORDERED** this 9th day of October, 2025.

Sara E. Hill
UNITED STATES DISTRICT JUDGE